## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

### Bid Protest

| | |
|---|---|
| **HIGHER EDUCATION LOAN AUTHORITY OF THE STATE OF MISSOURI**<br><br>**and**<br><br>**GRANITE STATE MANAGEMENT AND RESOURCES,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**THE UNITED STATES OF AMERICA,**<br><br>**Defendant.** | **No.**  19-478 C |

## COMPLAINT

Plaintiff, Higher Education Loan Authority of the State of Missouri ("MOHELA"), and Plaintiff, Granite State Management and Resources ("GSMR"), by and through the undersigned Attorney of Record, upon personal knowledge as to themselves, their own acts, and the contents of the documents referred to herein, and upon information and belief as to all other matters, hereby bring this bid protest action against Defendant, the United States of America, and for their Complaint allege as follows:

## NATURE OF THE ACTION

1.     This action is a pre-award protest against the U.S. Department of Education's (the "Department" or "Agency") procurement of a Next Generation Financial Services Environment ("NextGen"), which includes Solicitation No. 910031-19-R-0005 (Enhanced Processing Solution) ("EPS solicitation"), Solicitation No. 910031-19-R-0007 (Optimal Processing Solution) ("OPS solicitation"), and Solicitation No. 910031-19-R-0008 (Business Process

Operations) ("BPO solicitation").  Together, these three solicitations are referred to herein as the "NextGen solicitations."

2.      As set forth below, the Agency's procurement approach in the NextGen solicitations is contrary to law and regulation for several reasons.  First, the EPS solicitation and OPS solicitation are in violation of law because the Agency is attempting to acquire – from a single entity – (i) a new loan servicing information technology ("IT") system together with (ii) manual loan servicing operations capable of covering its entire current portfolio of over 37 million student loan accounts; whereas, the FY 2019 Appropriations Act mandated that the Department "shall not award funding for any contract solicitation for a new Federal student loan servicing environment … unless such an environment provides for the participation of *multiple* student loan servicers that contract *directly* with the Department of Education to manage a *unique portfolio of borrower accounts and the full life-cycle of loans from disbursement to pay-off* …"  *See* "Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019," Pub. L. No. 115-245, Sept. 28, 2018, 132 Stat. 2981, Div. B, Title III (the "FY 2019 Appropriations Act") (emphasis added).

3.      Notably, on March 19, 2019, the Department modified the EPS solicitation to remove "transitional" loan servicing.  In a status conference held in a related case, the Department of Justice commented that this action was taken "to take the loan servicing pieces out of the EPS procurement" and to "clear the way" for the EPS solicitation to move forward. *FMS Investment Corp., et al. v. United States*, Case No. 19-308, ECF No. 46, Mar. 21, 2019, Hearing Tr. 29:8-20.

4.      In striking "transitional" loan servicing from the EPS solicitation, however, the Department added the flexibility for it to order a wide variety of "manual" loan servicing

functions throughout the anticipated EPS contract's entire ten-year performance period.  In addition, the EPS solicitation still includes substantial requirements for printing, mailing and imaging correspondence with borrowers.  Thus, the EPS solicitation still contains critical, traditional loan servicing functions, which go far beyond acquiring an IT system and encroach upon substantial loan servicing work, including but not limited to payment processing, researching lost or misapplied payment, payment reapplication at the request of the borrower or FSA, credit bureau research resolution including direct and indirect disputes filed by borrowers or initiated by the credit bureaus, printing and mailing of all borrower correspondence, manual correction of errors, financial reporting, reconciliation, variance research, and resolving rejected transactions.  Contrary to the FY 2019 Appropriations Act's mandate, the revised EPS solicitation does **not** allow for multiple loan servicers to contract directly with the Department to manage unique portfolios of loans for their full life-cycle.

5.      Likewise, although the OPS solicitation was amended on March 27, 2019 such that it no longer contains line items specifically calling for business process operations, it still ambiguously includes requirements for "personnel to do manual processing related to financial functions, interface support, and error/dispute investigation and processing to be performed at the portfolio level."  Moreover, the OPS solicitation includes a laundry list of required "financial servicing functions" and "financial and portfolio level functions."  The identified services in those sections of the OPS solicitation are handled through individual borrower interactions, not automated IT features.  Thus, the Department has seemingly retained the flexibility to acquire "whatever it wants" under the EPS and OPS solicitations, including loan servicing work for both defaulted and non-defaulted accounts for up to ten years from a single vendor.

6.      In short, while the recent solicitation amendments purport to direct the focus of the EPS and OPS solicitations on procuring an IT system, those solicitations still contain critical, traditional loan servicing functions which seemingly can be continued with a single awardee for ten years.  This undercuts the integrity, and possibly the viability, of the BPO solicitation and highlights the necessity for the solicitations to proceed on parallel tracks in order to comply with the law.

7.      Second, all three NextGen solicitations are contrary to the Higher Education Act, 20 U.S.C. § 1087f, which obligates the Department to (1) give "special consideration" to certain entities such as MOHELA and GSMR in awarding contracts for loan servicing based on their participation in the Federal Family Education Loan Program and history of high quality performance, and (2) ensure that any contracts for loan servicing and collections are entered into only with entities that "have extensive and relevant experience and demonstrated effectiveness."

8.      Third, the EPS and OPS solicitations consolidate requirements for developing a new IT system together with requirements for loan servicing functions (for both defaulted and non-defaulted loans).  This approach is contrary to the Competition in Contracting Act ("CICA"), 41 U.S.C. § 3301(a), because it limits competition on these substantial requirements to vendors that can provide both a servicing system and servicing operations support.  In fact, for many years, the Department has not required its loan servicing contractors – which provide incalculable value by offering operational expertise and manpower to service millions of student loan accounts – to also be IT providers.  Indeed, the Department's separate BPO solicitation (which is moving on a substantially delayed path) is prima facie evidence that the Department has no need to acquire these requirements together.  There is no legitimate basis for combining operational requirements together with development of a new IT system in this procurement.

9.      Fourth, all three NextGen solicitations are littered with ambiguous, open-ended and conflicting requirements.  As a result, offerors are unable to make informed business decisions on the nature and extent of their participation in the various elements of this procurement.  Moreover, the ambiguities leave offerors unable to intelligently prepare proposals on the basis of a common understanding of the Department's requirements.  The Department's failure to describe its requirements in a clear and reasonable manner is contrary to law and regulation.  *See* 41 U.S.C. § 3306; Federal Acquisition Regulation ("FAR") 15.304(d); FAR 15.101-1(b); FAR 5.002; FAR 5.207.

10.     Accordingly, by this action, MOHELA and GSMR seek declaratory relief providing that (a) the EPS solicitation and OPS solicitation are contrary to applicable appropriations laws; (b) the Agency's procurement approaches in all three NextGen solicitations fail to comply with its obligations under the Higher Education Act; (c) the Agency's consolidation of loan servicing together with development of a new IT system imposes an unreasonable restraint on competition; and (d) the Agency's failure to describe its requirements in the NextGen solicitations in a clear and reasonable manner precludes a fair competition in violation of law and regulations.

11.     MOHELA and GSMR also seek injunctive relief prohibiting the Agency from moving forward with any contract awards under the NextGen solicitations in light of these violations, the public interest of ensuring that government procurements are carried out fairly and in accordance with law and regulation, as well as the irreparable harm to MOHELA and GSMR that outweighs any harm to the Agency.

## JURISDICTION

12.     This Court has jurisdiction over the subject matter of this Complaint pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1), because MOHELA and GSMR are alleging violations of law and regulation in connection with the NextGen solicitations.

13.     MOHELA and GSMR are interested parties to file and pursue this protest. MOHELA and GSMR submitted separate proposals to the Agency under "Phase I" of the February 20, 2018 iteration of the NextGen procurement.  After MOHELA and others filed pre-award protests in this Court challenging the Agency's "Phase II" solicitations (Case No. 18-cv-01679, *et al.*), the Agency announced on December 14, 2018 that it was taking corrective action.

14.     The Agency issued the current NextGen solicitations on January 15, 2019 in order to replace solicitations covering requirements for which MOHELA and GSMR had previously submitted proposals, and which MOHELA had previously protested before the U.S. Government Accountability Office ("GAO") and this Court.

15.     MOHELA and GSMR are fully qualified to submit proposals under the BPO solicitation.  Further, but for the contested issues raised herein, MOHELA and GSMR would have a substantial chance of obtaining contracts to provide the Agency with the loan servicing work that has been improperly included in the EPS and OPS solicitations.

## THE PARTIES

16.     Plaintiff, MOHELA, is a public instrumentality and body politic and corporate of the State of Missouri, established in 1981 pursuant to the Missouri Higher Education Loan Authority Act, §§ 173.350 to 173.445 of the Missouri Revised Statutes.  MOHELA's principal place of business is at 633 Spirit Drive, Chesterfield, MO 63005.  MOHELA is widely recognized for its world-class student loan servicing and is currently a prime contractor to the

Department for these services.  MOHELA is the fifth-largest servicer of student loans originated and funded directly by the Department, and in recent years MOHELA has been ranked as the highest performing servicer, as measured by the Department's performance metrics, in every rating period.

17.     Plaintiff, GSMR, along with its affiliate New Hampshire Higher Education Loan Corporation ("NHHELCO"), were organized through the New Hampshire Higher Education Assistance Foundation ("NHHEAF").  All three entities are nonprofit organizations under Internal Revenue Code § 501(c)(3).  GSMR's principal place of business is at 4 Barrell Ct, Concord, NH 03301.  GSMR is also a widely-recognized leader providing best-in-class student loan servicing and is a subcontractor under the Department's current program for these services.

18.     Defendant, the United States of America, for all purposes relevant hereto, acted by and through the Department's Office of Federal Student Aid ("FSA") in Washington, D.C.

## FACTUAL BACKGROUND

A.     <u>Background on Federal Student Loan Servicing</u>

19.     Pursuant to the Higher Education Act of 1965, Pub. L. No. 89-329, Congress established the guaranteed student loan program known as the Federal Family Education Loan Program ("FFELP"), allowing banks and private institutions to provide loans to students that were guaranteed by the federal government.  MOHELA and GSMR's sister organization (NHHEAF) are among the entities that entered agreements with the Department under 20 U.S.C. § 1078(b) and (c) to participate in FFELP.  FFELP accounted for the majority of all federal student loans made prior to 2010.

20.     In 2010, FFELP was effectively replaced with the William D. Ford Federal Direct Loan Program (the "Direct Loan Program"); however, millions of loans made under FFELP

continue to be serviced and collected upon.  In contrast to FFELP, the Direct Loan Program

allows students to obtain loans directly from the Department, *i.e.*, the loans are funded by the

government but actually serviced by contractors who specialize in those operational processes.

21.     Although the Direct Loan Program is currently the primary government-backed

student loan program available in the U.S., it began as a pilot "demonstration" program.  *See*

"Higher Education Amendments of 1992," Pub. L. No. 102-325, July 23, 1992, 106 Stat. 448,

Title IV, Part D, § 451 *et seq*.  As part of that demonstration, in or about 1993, the Department

contracted with a company known as ACS Education Solutions ("ACS") as the single provider

of both the software platform and the loan servicing for all student loan accounts processed

under the Direct Loan Program.

22.     The single servicer and single software platform established for the Direct Loan

Program proved to be what was widely reported as extremely costly to the federal government

and to the student loan borrowers, while also providing very poor service and a lack of access to

benefits and services otherwise available through a competitive and performance-based student

loan servicing marketplace.

23.     In light of this experience, the Department issued a solicitation and selected four

large and established student loan servicers in 2009 to assist with the rapidly-growing Direct

Loan Program.  *See* Contract Nos. EDFSA09D0012, EDFSA09D0013, EDFSA09D0014, and

EDFSA09D0015.  Those four companies, referred to as Title IV [from Title IV of the Higher

Education Act] Additional Servicer entities or "TIVAS entities," were:  (a) "Navient," a spinoff

of Sallie Mae and a publicly-traded Delaware corporation; (b) "Nelnet," a publicly-traded

Nebraska corporation; (c) the Pennsylvania Higher Education Assistance Agency, a state agency

headquartered in Harrisburg, Pennsylvania ("PHEAA"); and (d) Great Lakes Educational Loan

Services, Inc. ("Great Lakes"), a for-profit corporation headquartered in Madison, Wisconsin.

24.     The 2010 amendments to the Higher Education Act required that, effective July 1,

2010, all new federal student loans would be Direct Loans made by the federal government, and

the origination of new loans under FFELP would cease as of that date.  "Health Care and

Education Reconciliation Act," Pub. L. No. 111-152, March 30, 2010, 124 Stat. 1029, Title II,

Part II, § 2201 *et seq*. ("HCERA").  However, loans made under FFELP through entities such as

MOHELA and GSMR's sister organization continue to be serviced and collected upon.

25.     The HCERA legislation reflected Congress' intent and expectation that the

Department implement and foster a performance-based, competitive student loan servicing

environment for purposes of the Direct Loan Program.  Specifically, the Department was

required to contract with and assign each qualifying Not-For-Profit ("NFP") servicer a minimum

of 100,000 borrower accounts.  *Id*., § 2212 (amending 20 U.S.C. § 1087f (2010)).  At the time,

there were nearly three dozen NFPs that met the qualification requirements, including

MOHELA.

26.     The Department and MOHELA executed a contract in September 2011 pursuant

to which MOHELA became the first NFP with a prime servicing contract for Direct Loans.

Around this same time, the Department and NHHELCO (an affiliate of GSMR) also executed a

Direct Loan prime servicing contract.  The Department awarded prime contracts to a number of

additional NFPs, in addition to continuing its contracting relationships with the TIVAS entities.

27.     The 2011 NFP servicing contracts were awarded for a five-year period of

performance, and they were renewed in 2016 for many NFPs (including MOHELA and

NHHELCO) for an additional performance period that is scheduled to end in September 2019. In 2012, NHHELCO added GSMR as a key subcontractor to its contract with the Department.

28.     There are currently nine student loan servicing entities, *i.e.*, five NFPs (including MOHELA and NHHELCO/GSMR) and four[1] TIVAS entities, which contract directly with the Department to service the Department's Direct Loan portfolio – a portfolio that exceeds 37 million student loan accounts.

29.     Significantly, only the four TIVAS entities maintain their own proprietary loan servicing software, and they license the use of their IT systems to the five prime NFP loan servicers.  MOHELA has a license to use the PHEAA software platform, and NHHELCO/GSMR has a license to use the Nelnet software platform.

B.     The 2016 Procurement

30.     On April 4, 2016, the Department issued Phase I of a two-phase solicitation[2] in which the stated purpose was to acquire a single loan servicing software system that would be utilized by the multiple student loan servicing entities.  Five offerors submitted proposals in response to Phase I of the 2016 solicitation, which did not include MOHELA or GSMR because they do not own a student loan servicing system and have performed their services using licensed software.

31.     On October 26, 2016, the Department issued the second phase of its procurement via Solicitation No. ED-FSA-17-R-0001.  Consistent with the first phase, that solicitation's purpose was to acquire the IT system only, and it made clear that the IT system would be made

---

[1] Great Lakes was recently acquired by another TIVAS entity (Nelnet), although it is not clear whether they continue to operate independently for purposes of obtaining federal contracts.

[2] The solicitation was unnumbered and did not conform to the Uniform Contract Format in FAR 15.204-1.

available by the government to all nine student loan servicing contractors (*i.e.*, the TIVAS and

NFPs) to enable those contractors to operate on a uniform technology platform.  Significantly,

that solicitation demonstrated that the Department knows how to acquire a loan servicing

platform separately from the loan servicing operational support.

32.     On May 19, 2017, however, the Department amended that solicitation to

completely eliminate the concept that the loan servicing solution would "be utilized by multiple

customer service providers."  In fact, the Department shifted that procurement to a "winner-take-

all" approach whereby the awardee of the IT system contract would also be providing the manual

and operational loan servicing work (*i.e.*, making phone calls, processing payments, printing and

mailing correspondence, resolving credit disputes, performing financial reporting/reconciliation

and otherwise communicating with borrowers – the work that MOHELA and GSMR perform)

for the Department's current and future portfolio of borrower accounts.

33.     On July 7, 2017, MOHELA submitted a pre-award protest to the GAO, docketed

as B-414262.2, in which MOHELA objected to the Agency's substantial change in its

requirements.  MOHELA's protest explained that the Agency's expansion of its requirements,

which had occurred after a down-selection of eligible offerors that had submitted proposals only

for the software solution and excluded MOHELA, was contrary to the CICA.  MOHELA also

emphasized that the Agency's decision to acquire all loan servicing from a ***single entity*** was

contrary to Congress' mandate in the FY 2017 appropriations law, which stated as follows:

> *Provided*, That the Secretary shall allocate new student loan
> borrower accounts to eligible student loan servicers on the basis of
> their performance compared to all loan servicers utilizing
> established common metrics, and on the basis of the capacity of
> each servicer to process new and existing accounts...

"Consolidated Appropriations Act, 2017," Pub. L. No. 115-31, May 5, 2017, 131 Stat. 135, Div. H, Title III.

34.     On August 1, 2017, prior to the due date for the Agency Report, the Department announced that it had decided to cancel the solicitation as "no longer accurately reflect[ing] the agency's requirements."  The notice stated that the Department's anticipated revisions "would be so substantial as to exceed what prospective offerors reasonably could have anticipated" and thus "[a]dditional sources likely would have submitted offers had the substance of the proposed revised requirements been known to them."  Accordingly, the GAO dismissed the 2017 MOHELA bid protest as academic.

C.     The NextGen Phase I Solicitation

35.     On December 11, 2017, the Department announced that it was "embarking on a new vision known as the Next Generation (NextGen) Financial Services Environment."  The Agency issued a request for information to prospective offerors explaining that its vision included dividing the procurement into discrete "components."  This included single systems/providers for certain technological aspects of the NextGen environment, and multiple loan servicers for the operational aspects of the NextGen environment.  Importantly, that request for information recognized the logical and historical separation of the IT aspects of the federal student loan servicing program from its manual and operational aspects.

36.     For instance, there was a component of the procurement that would be dedicated to the "[c]ore processing platform, including rules engine, workflow, and core servicing system," which was further explained as the environment that "will perform all loan servicing processing across FSA's various repayment plans, customer segments, loan statuses, and special programs."  There was a separate component anticipated for "Processing Operations," which would include

the manual aspects of loan servicing, such as "[r]eview, validation, and processing capabilities associated with enrollment, applications, and requests for various borrower programs and loan status adjustments," "[e]rror and dispute resolution investigation and processing capabilities," and "[m]anual processing and support required to assist FSA reporting and oversight." Responses to the request for information were requested by January 4, 2018.

37.     On February 20, 2018, the Department issued Phase I of a two-phase solicitation to acquire the NextGen solutions that had been contemplated in the request for information.  The Phase I Solicitation explained that, in the current environment, each of nine different loan servicers "operates its own engagement layer with proprietary branding (e.g., websites, mobile tools, contact centers), utilizes one of four servicing platforms, and maintains certain additional technical systems."  According to the Department, the use of different technology had created a "fragmented vendor landscape" and resulted in inconsistent customer experiences, limited branding opportunities (for FSA), and operational complexities.

38.     The Department identified its vision for the NextGen procurement as including: (1) "an enterprise-wide, FSA-branded omni-channel digital platform" that "will consolidate the multiple websites, mobile applications, and contact centers that currently exist across the full customer lifecycle (from application to servicing and default)"; (2) "a common, integrated data management platform which contains all information of each student throughout the lifecycle" to generate customer insights and reduce error rates; (3) "enterprise-wide cybersecurity"; (4) solutions that are "implemented with both integration and future scalability in mind"; and (5) a model that "will allow business process operations providers to 'plug-in' these solutions while providing customers with a consistent, world-class customer experience."  ***In other words, the***

***Department's vision required a common technical backbone for use by its multiple loan servicers to interact with borrowers on a consistent basis.***

39.     Consistent with the request for information's use of "components" to segregate the different aspects of this procurement, the Phase I Solicitation delineated the following nine different "Components" of contractor support that the Department had identified as being necessary to realize its vision, and offerors were permitted to respond to individual, multiple or all Components:

- **Component A:** Enterprise-wide digital platform and related middleware
- **Component B:** Enterprise-wide contact center platform, customer relationship management (CRM), and related middleware
- **Component C:** Solution 3.0 (core processing, related middleware, and rules engine)
- **Component D:** Solution 2.0 (core processing, related middleware, and rules engine)
- **Component E:** Solution 3.0 business process operations
- **Component F:** Solution 2.0 business process operations
- **Component G:** Enterprise-wide data management platform
- **Component H:** Enterprise-wide identity and access management (IAM)
- **Component I:** Cybersecurity and data protection

40.     In essence, as set forth in Phase I, Solution 3.0 entailed the development and maintenance of a single environment for FSA's new customers, and Solution 2.0 was the environment that would be developed and maintained for FSA's existing customers. Components C and D were to include the ***technical systems*** necessary to service loans that reside in Solutions 3.0 and 2.0, respectively; whereas, Components E and F were to include the ***operational functions*** (such as the contact centers, back-office support, error/dispute resolution and correction, account maintenance, financial-related functions, and printing/mailing all servicing related materials) necessary to service the loans in Solutions 3.0 (Component C) and 2.0 (Component D) to the extent those operational functions were not automated.

41.     To reiterate, the Phase I Solicitation anticipated that "all" business process operations, including print/mail operations and any transitional periods, would be provided by the selected contractors under Components E and F.  This was logically segregated from the technical systems to be provided by the selected contractors under Components C and D.  Thus, the Phase I Solicitation demonstrated the Department could achieve its goals by acquiring a common technical solution separately from the operational aspects of the work.

42.     As nationally-recognized leaders in student loan servicing and current contractors to the Department for servicing student loans originated and funded by the Department, MOHELA's and GSMR's primary interests were in providing business process operations for all aspects of loan servicing, to include but not limited to customer contacts, error/dispute resolution, print/mail and back-end processing.  Having recognized that the Phase I Solicitation allocated all business process operations within Components E and F, MOHELA and GSMR each submitted their own responses to the solicitation as prime contractors on Components E and F prior to the April 18, 2018 deadline.

D.      The NextGen Phase II Solicitations

43.     On September 24, 2018, the Department issued Phase II solicitations.  In doing so, the Department split Component D and Component C into separate solicitations (Nos. 91003118R0022 and 91003118R0023, respectively) and consolidated Components E and F together under a different solicitation (No. 91003118R0024).

44.     Additionally, the Department announced the limited subset of offerors that had been selected to participate in Phase II of the Component C, D, E and F solicitations.

45.     Nine offerors were selected to participate in Phase II of the Components E and F solicitation, including MOHELA, Edfinancial Services LLC, General Dynamics Information

Technology Inc. ("GDIT"), Nelnet, Oklahoma Student Loan Authority, PHEAA,

Teleperformance, Trellis Company, and Utah Higher Education Assistance Authority.  GSMR's

offer was excluded from Phase II for reasons unrelated to this action.

46.     Four offerors were selected to participate in Phase II of the Component D

solicitation, namely, GDIT, Infosys, Nelnet, and PHEAA.

47.     With respect to its scope, the solicitation for Phase II Component D still covered

development and maintenance of the technical (IT) environment for FSA's existing customers;

however, the Agency also moved a substantial portion of the scope from Components E and F to

Component D.  In particular, the Agency added requirements to Component D that would permit

it to also acquire business process operations, including but not limited to contact center support,

student aid back-office processing and print/mail services, under the awarded contract.

Significantly, although a portion of those business process operations services were labeled as

covering only a "transitional" period, there was no defined end to the transitional period.  The

Component D solicitation stated that these "transitional" services would continue "until the

future state business process operations (responsible for contact center support, student aid back-

office processing) are fully implemented or *as otherwise determined by FSA*" (emphasis added).

E.      MOHELA's 2018 GAO Protest

48.     Prior to the due date for proposals under Phase II Component D, on October 31,

2018, MOHELA filed a pre-award bid protest at the GAO, which was docketed as B-417078.1.

49.     MOHELA's protest contended that the Agency's movement of certain services to

Component D of the Phase II RFP was unreasonable and improper because:  (a) Component D

was structured as a single-award contract and therefore the Agency's procurement of business

process operations thereunder was in direct conflict with Congress' mandate in the FY 2018 and

FY 2019 Appropriations Acts; (b) the changes were so substantial as to exceed what prospective offerors, including MOHELA, reasonably could have anticipated when the Phase I Solicitation was originally issued, and therefore violated the CICA; (c) the changes expanded the Component D procurement far beyond the scope and the purpose described in the Phase I Solicitation, thereby violating the very statute upon which the two-phase procurement was authorized, 20 U.S.C. § 1018a; (d) the changes made in the Phase II Component D solicitation were so substantial that they rendered the procurement in violation of FAR 15.206; and (e) the changes unduly restricted competition by improperly bundling or consolidating requirements in a manner that was beyond the Department's legitimate needs.

50.     On November 8, 2018, the GAO dismissed MOHELA's protest pursuant to 4 C.F.R. § 21.11(b) because a bid protest had been filed in the U.S. Court of Federal Claims involving the same procurement, namely, *Navient Solutions, LLC v. United States*, Case No. 18-1679.

F.     MOHELA's 2018 Bid Protest in this Court

51.     On November 14, 2018, MOHELA filed a bid protest in this Court challenging the Phase II NextGen solicitations, and the protest was docketed as *Higher Education Loan Authority of the State of Missouri v. United States*, Case No. 18-1758.  The Court consolidated MOHELA's action with the *Navient* case and other bid protests that had been filed concerning the NextGen procurement, including those of certain providers of default collection services.

52.     On November 16, 2018, MOHELA filed a motion for a temporary restraining order and preliminary injunctive relief requesting that the Court prohibit the Department from proceeding with soliciting proposals or making any contract awards under the NextGen procurement until resolution of its bid protest.

53.     On November 18, 2018, the Department agreed to delay the due date for receipt of proposals under Phase II Component D in order to permit time for briefing and argument on MOHELA's motion.

54.     On December 4, 2018, the Court held oral argument on MOHELA's motion for a preliminary injunction.  At the conclusion of oral argument, the Court commented in part that:

> As I understand the case at this point…the former default student loan contractors, who are among the Plaintiffs in this case, seem to have a fairly convincing argument that they have been excluded from the competition in this NextGen procurement now that default student loans have been added to the mix and, yet, they're not in a position to compete.

Case No. 18-1679, ECF No. 57, Dec. 4, 2018, Hearing Tr. 33:2-10.

55.     In response to the Court's comments, the Department agreed at the hearing to delay the due date for receipt of proposals under Phase II Component D while it considered whether to voluntarily take corrective action.

56.     On December 14, 2018, the Department represented to the Court that it would take corrective action that "will render the consolidated plaintiffs' claims moot because it provides the consolidated plaintiffs with the relief they seek: a fresh opportunity to participate in the solicitation for support across the student aid lifecycle covered by NextGen components C, D, E, and F."  Case No. 18-1679, ECF No. 66 at 1.

57.     On January 15, 2019, the Department cancelled the NextGen Phase II solicitations for Components C, D, E and F and issued new solicitations covering substantially the same work.  On the same day, the government requested that MOHELA's complaint and the other consolidated plaintiffs' complaints be dismissed as moot.

58.     The Court granted the government's motion to dismiss on February 12, 2019.

G.    The Current NextGen Solicitations

59.    On January 15, 2019, the Department issued the three solicitations that are the subject of this protest, namely, the EPS solicitation, the OPS solicitation, and the BPO solicitation.  In contrast with the Department's past two procurement efforts, these solicitations do not contemplate the Department's use of a two-phased procurement approach.

60.    In a nutshell, the Department purports that the following are the roles of the solicitations:  the EPS solicitation is an IT platform accommodating the migration of all existing borrower accounts, the OPS solicitation is an IT platform designed to accommodate future borrower accounts, and the BPO solicitation is designed to provide for the traditional loan servicing of the borrower accounts.  However, as discussed herein, the EPS and OPS solicitations materially intrude upon and undermine the loan servicing purported to be handled by the BPO solicitation.

**i) The EPS Solicitation**

61.    The Department describes the EPS solicitation as the IT platform for all existing student loan borrower accounts.  However, as described below, it is actually an open door for a sole student loan servicer to step through.

62.    The EPS solicitation describes the Department's objectives as follows:

The Enhanced Processing Solution (Solution) will serve as the student financing servicing environment for FSA's existing customers. Solution will provide full "life of the loan" servicing: servicing loans for customer accounts of all statuses, including those that are in default. Solution will rapidly migrate existing loans from current servicers, through loan migration (maintaining dynamic and complete customer historical data) while minimizing customer disruption, per target milestones 2 and 3 (Section C.3.5). Solution will also deploy advanced capabilities to provide customers with a world-class experience, improve automation (i.e., reduce manual processing) and system flexibility, and reduce operational complexity and inefficiency for FSA.

EPS solicitation, p. 6, § C.3.1 (emphasis added).

63.     The EPS solicitation currently anticipates awarding a single firm-fixed price contract that includes line items for: (1) Solution Delivery, which is to be completed no later than three months after award; (2) Solution Operations and Maintenance, which includes a base period of one year and nine one-year option periods; (3) Optional Imaging/Printing/Mailing, with a base period of five years and one five-year optional ordering period; and (4) Optional Digital Engagement Layer, which includes a base period of two years and a one-year optional period.

64.     When the EPS solicitation was originally published on January 15, 2019, it also provided that the EPS awardee would serve as the "sole" provider of business process operations until the awardees under the BPO solicitation became "fully operational," and it included a line item under which the EPS awardee would continue to service approximately 20% of the student loans for up to 15 years after that "transitional" period concluded.

65.     On March 6, 2019, the Department amended the EPS solicitation such that the EPS awardee's ability to provide business process operations support would cease within 12 months of the awardees under the BPO solicitation becoming fully operational, but the EPS solicitation maintained that the awardee would serve as the "sole" provider of business process operations for a "transitional" period of up to four years – limited only by the "discretion" of FSA.  The March 6 amendment also added certain loan servicing functions to be performed by the EPS awardee, including interface support, loan consolidation origination applications and request processing, and credit dispute research and resolution.

66.     On March 19, 2019, the Department amended the EPS solicitation in an apparent attempt to remove its prior objective of having the EPS awardee provide transitional business process operations.  The Department did not remove its line items or objectives that require the

single EPS awardee to be responsible for all printing/mailing/imaging, which together constitute

a considerable aspect of loan servicing.  Further, the Department added that at any point

throughout the EPS contract's ten-year term, the EPS awardee may be required to perform, via

"manual intervention," certain operational functions that include tasks that MOHELA and

GSMR perform as loan servicers, including but not limited to:

- Payment processing, including, receipt and applications of cash and non-cash payments accounts as well as research and resolution of lost or misapplied payments;

- Interface support, including tracking Work in Process (WIP) and resolving rejected transactions from other FSA systems (*e.g.*, NSLDS, FMS, origination system);

- Financial reporting, reconciliation and variance research;

- As needed support of audits (*e.g.*, annual audit reports such as the Service Organization Controls Type II Statements on Standards for Attestation Engagements (SSAE18));

- Research and resolution of treasury issues;

- Loan consolidation origination applications and request processing;

- Comprehensive cash management;

- Dynamic loan portfolio management;

- Effective internal financial controls; and,

- Credit bureau research resolution, including direct and indirect credit bureau disputes filed by customers or initiated by the credit bureaus.

EPS solicitation, p. 10, § C.3.3.b.

67.     In addition, the EPS solicitation provides that the solution "shall conduct error

and dispute resolution investigation and processing, including, but not limited to … Account

maintenance, including manual correction of errors identified through data integrity scans; and,

… Payment processing, including researching lost or misapplied payments and payment

reapplication at the request of customers or FSA."  *Id*.  Additionally, the "Solution shall provide

personnel to do manual processing related to financial functions, interface support, and error/dispute investigation and processing to be performed at the portfolio level." *Id.*

68.   The current operating elements of the proposed EPS solution include migrating 37 million customer loan and grant accounts from existing servicers and from the Default Management Collection System to the new environment.  The EPS awardee is also tasked with executing the full range of "life of the loan" servicing functions (such as consolidation, origination and default support), which includes "manual intervention" on various loan servicing tasks as listed above, an optional task for imaging, printing and mailing communications with borrowers, and another optional task for a temporary digital engagement layer until the future state digital platform solution is implemented.

69.   In other words, the EPS solicitation anticipates a rapid IT development period and up to ten years of IT support, and permits the Department to order a wide range of manual loan servicing work thereunder at any time.  When those "manual" tasks are paired with the EPS awardee's responsibility for all printing, mailing and imaging operations, it is clear that the Department has retained the flexibility to order most if not all of its loan servicing needs from the single EPS awardee.  Moreover, the EPS solicitation contains no milestone(s) for the onboarding of awardees under the BPO solicitation to the new platform.

70.   In accordance with the terms of the EPS solicitation, MOHELA timely submitted questions to the Department before January 30, 2019.  On February 19, March 6, March 19, and March 26, the Department published responses to a total of 117 offeror questions.  Those responses did not address a substantial number of questions that had been raised by MOHELA.

71.   The Department's response to relevant questions include the following:

- **Question 2**:  Will multiple contracts for Enhanced Processing Solutions be awarded?

    - **Answer**:  FSA intends to make one award for the Enhanced Processing Solution.

- **Question 30**:  For the EPS milestones, what is the milestone to onboard separate BPOs?

    - **Answer**:  The schedule for the EPS vendor to support the onboarding of BPO providers is to be determined. However, FSA expects to make BPO awards within three (3) months of the EPS award.

72.     The due date for receipt of initial proposals under the EPS solicitation is April 2, 2019.

73.     In summary, this purported IT solution anticipates a sole awardee providing critical traditional loan servicing functions for an extended period.

**ii) The OPS Solicitation**

74.     Similar to the EPS solicitation, the Department describes the OPS solicitation as the IT platform for all future student loan borrower accounts.  However, it too is actually the opening for a sole student loan servicer.

75.     The OPS solicitation describes the Department's objectives as follows:

> Optimal Processing Solution shall be a highly adaptable solution set which supports current and future FSA products and processes <u>across the entire lifecycle of student financing, including but not limited to:  functions for application for financing, to origination and disbursement, to processing and servicing and pay off or default</u>. Solution will deploy integrated functions and products over time. Solution shall deliver cost efficiencies through significantly increased automation and a modern technical backbone (e.g., modular code base, cloud operability, two speed development compatibility, and/or innovative middleware) Solution shall better support changing rules, laws, and regulations with minimal operational complexity through the greater flexibility afforded by having separate rules engine(s) and integrated process workflows.

OPS solicitation, p. 7, § C.2.1 (emphasis added).

76.     The OPS solicitation currently anticipates awarding a single firm-fixed price contract with a one-year base period and nine one-year option periods.

77.     When the OPS solicitation was originally published on January 15, 2019, it also included a line item and ordering procedures for business process operations, including a base ordering period of five years and two five-year optional ordering periods.   On March 27, 2019, the Department amended the OPS solicitation to, among other things, remove the business process operations line item.  However, the "operating elements" and related requirements still include critical aspects of loan servicing as described below.

78.     As currently structured, the OPS solicitation includes three operating elements for development/implementation of different aspects of the solution, as well as three corresponding operating elements for maintenance of those respective solutions.  Specifically, Operating Element 1 includes development/maintenance of the "Eligibility Processing Solution," Operating Element 2 includes development/maintenance of the "Origination and Disbursement Processing Solution," and Operating Element 3 is development/maintenance of the "Servicing Support Solution."

79.     With respect to Operating Element 3, the OPS solicitation states that the solution shall execute the full range of "life of the loan" servicing functions.  In relevant part, the solicitation requires the OPS awardee's "solution" to execute a list of "student financing servicing functions," including "but not limited to":

- loan status tracking;

- eligibility requirement assessment/annual recertification;

- loan consolidation origination;

- switching repayment plans; and

- retroactive processing.

OPS solicitation, Am. 2, p. 21 (emphasis added).

80. The OPS awardee's "solution" is also required to perform a list of "financial and portfolio level functions," including "but not limited to":

- payment processing;

- interface support;

- financial reporting/reconciliation;

- audit support;

- treasury issues;

- loan consolidation origination applications and request processing;

- cash management;

- credit disputes;

- portfolio management; and

- internal financial controls.

*Id.*, pp. 21-22 (emphasis added).

81. The OPS solicitation also requires that the "solution" conduct "error and dispute resolution investigation and processing, including, but not limited to…Account maintenance, including manual correction of errors identified through data integrity scans, and…Payment processing, including researching lost or misapplied payments and payment reapplication at the request of customers or FSA." *Id.*, p. 22.

82. Again, the foregoing represent tasks that MOHELA and GSMR perform today as loan servicers.

83.    With respect to the separate BPO solicitation, the OPS solicitation ambiguously

states:

> Solution shall automate all possible servicing and other functions
> to minimize manual processing. Solution may only rely on
> streamlined manual processing by the separately provided
> Business Process Operations in the cases where automation is not
> feasible; however, <u>Solution shall provide personnel to do manual
> processing related to financial functions and error/dispute
> investigation and processing to be performed at the portfolio level.</u>

*Id.* (emphasis added).

84.    Despite the references to business process operations being contracted separately,

the OPS solicitation provides no guidance on what is meant by FSA's incorporation of personnel

under OPS to perform manual processing, FSA's intended meaning of the phrase "at the

portfolio level," or how such a distinction could possibly comply with the appropriations laws

which obligate the Department to contract directly with multiple student loan servicers to

manage unique portfolios from disbursement to pay-off.  Moreover, the OPS solicitation contains

no milestone(s) for the onboarding of awardees under the BPO solicitation to the new platform.

85.    These ambiguous and conflicting statements, combined with the fact that the

Department is separately soliciting these services under the BPO solicitation, leaves it entirely

unclear whether any manual aspects of loan servicing are included in the OPS solicitation's

requirements and, if so, the extent of that loan servicing work.

86.    In accordance with the terms of the OPS solicitation, MOHELA timely submitted

questions to the Department before February 8, 2019.  On March 27, 2019, the Department

published responses to a total of 135 offeror questions.  Those responses did not address a

substantial number of questions that had been raised by MOHELA.

87.     The due date for receipt of initial proposals under the OPS solicitation is May 8, 2019.

88.     This purported IT solution contains critical traditional loan servicing functions.

**iii) The BPO Solicitation**

89.     The BPO solicitation is touted by the Department as the contract vehicle for actual student loan servicing.  As described herein, the concern is that the Department will never get to this solicitation (it has no proposal due date) and will instead have the servicing performed under the EPS/OPS solicitations.

90.     The BPO solicitation describes the Department's objectives as follows:

> Business Process Operations will support efficient and effective operations, across the entire life cycle of student financing (from application for financing, to origination and disbursement, to processing and servicing and pay-off or default). Business Process Operations will do so under FSA's single brand, by providing the personnel necessary to respond to inbound customer (e.g. student applicants, borrowers, etc.) and partner (e.g. schools) inquiries, execute separately-developed outbound outreach campaigns, and perform back-office processing activities that cannot be automated. These personnel will provide an enhanced level of service, across the full life cycle of student financing, beyond today's environment and one that is consistent with leading financial services providers and other industry leaders recognized for their customer service. Solutions will also support the seamless transition of customers and partners from existing to new solutions, most especially the Enhanced Processing Solution and/or Optimal Processing Solutions, Digital Platform, and Contact Center.

91.     The BPO solicitation anticipates multiple contract awards with a base ordering period of five years with one five-year optional ordering period.

92.     The operating elements of the BPO solicitation include providing contact center support and back-office activities across the life cycle of student financing, "especially those [sic] cannot be automated with other relevant solutions."  The BPO solicitation specifically

excludes imaging, printing and mailing operations from the back-office processing tasks, even though those operations require substantial manual effort.

93.     In accordance with the terms of the BPO solicitation, MOHELA and GSMR timely submitted questions to the Department before February 8, 2019.  On February 20, 2019, the Department published responses to 22 offeror questions.  Those responses did not address a substantial number of questions that had been raised by MOHELA and GSMR.

94.     The BPO solicitation does not provide a due date for the submission of initial proposals.  Rather, the BPO solicitation states:  "The Government will post the proposal due date for all volumes after an award for the Enhanced Processing Solution is made."

## COUNT I

## THE EPS SOLICITATION AND OPS SOLICITATION ARE CONTRARY TO LAW BECAUSE THEY VIOLATE THE FY 2018 AND FY 2019 APPROPRIATIONS ACTS

95.     Plaintiff incorporates by reference Paragraphs 1 through 94 as if fully set forth herein.

96.     While the recent solicitation amendments purport to direct the focus of the EPS and OPS solicitations on procuring IT systems, those solicitations still contain critical, traditional loan servicing functions which seemingly can be continued with a single awardee for up to ten years.  This undercuts the integrity, and quite possibly the viability, of the BPO solicitation and highlights the necessity for the solicitations to proceed on parallel tracks in order to comply with the law and ensure the EPS or OPS awardee is not performing loan servicing.

97.     For instance, Congress has repeatedly expressed that the Department must contract for student loan servicing using a performance-based approach that enables ongoing competition and choices among multiple loan servicers.  Going back to the FY 2016 Appropriations Act, Congress mandated that the Department allocate new student loan borrower

accounts to eligible student loan servicers (both TIVAS entities and NFPs) on the basis of their

performance compared to all loan servicers utilizing established common metrics, and based on

the capacity of each servicer to process new and existing accounts, providing:

> …That the Secretary shall, no later than March 1, 2016, allocate
> new student loan borrower accounts to eligible student loan
> servicers on the basis of their performance compared to all loan
> servicers utilizing established common metrics, and on the basis of
> the capacity of each servicer to process new and existing accounts.

"Consolidated Appropriations Act, 2016," Pub. L. No. 114-113, Dec. 18, 2015, 129 Stat. 2242,

Div. H, Title III.

98.     The FY 2017 statute reiterated this directive and added that the Department must

permit choices for borrowers among student loan servicers when consolidating their student

loans, stating:

> … That the Secretary shall allocate new student loan borrower
> accounts to eligible student loan servicers on the basis of their
> performance compared to all loan servicers utilizing established
> common metrics, and on the basis of the capacity of each servicer
> to process new and existing accounts...
>
> *Provided further*, That the Secretary shall … allow student loan
> borrowers who are consolidating Federal student loans to select
> from any student loan servicer to service their new consolidated
> student loan.

"Consolidated Appropriations Act, 2017," Pub. L. No. 115-31, May 5, 2017, 131

Stat. 135, Div. H, Title III.

99.     Accordingly, through FY 2017, Congress had expressed its intent and mandate

that the Department shall allocate new borrower accounts among the TIVAS entities and NFP

servicers based on performance metrics and shall allow borrowers to have choices among the

loan servicers when consolidating student loans.

100.    The FY 2018 Appropriations Act expanded on these directives *by explaining their applicability to the FSA's NextGen procurement*:

> For Federal administrative expenses to carry out part D of title I, and subparts 1, 3, 9, and 10 of part A, and parts B, C, D, and E of title IV of the HEA, and subpart 1 of part A of title VII of the Public Health Service Act, $1,678,943,000, to remain available through September 30, 2019…
>
> *Provided,* That the Secretary shall allocate new student loan borrower accounts to eligible student loan servicers on the basis of their performance compared to all loan servicers utilizing established common metrics, and on the basis of the capacity of each servicer to process new and existing accounts…
>
> *Provided further*, That the Secretary shall … allow student loan borrowers who are consolidating Federal student loans to select from any student loan servicer to service their new consolidated student loan under the current student loan servicing contracts…
>
> *Provided further*, That in order to promote accountability and high-quality service to borrowers, the Secretary **shall not award funding for any contract solicitation for a new Federal student loan servicing environment**, including the solicitation for the FSA Next Generation Processing and Servicing Environment as amended by the Department of Education on February 20, 2018, **unless such an environment provides for the participation of multiple student loan servicers that contract directly with the Department of Education to manage a unique portfolio of borrower accounts and the full life-cycle of loans from disbursement to pay-off** with certain limited exceptions, and allocates student loan borrower accounts to eligible student loan servicers based on performance…
>
> *Provided further*, That such servicers described in the previous proviso shall be evaluated based on their ability to meet contract requirements, future performance on the contracts, and history of compliance with applicable consumer protections laws…

"Consolidated Appropriations Act, 2018," Pub. L. No. 115-141, Mar. 23, 2018, 132 Stat. 348, Division H, Title III (bold emphasis added).

101.    Substantially similar language was included by Congress and signed into law in

the FY 2019 Appropriations Act:

> For Federal administrative expenses to carry out part D of title I,
> and subparts 1, 3, 9, and 10 of part A, and parts B, C, D, and E of
> title IV of the HEA, and subpart 1 of part A of title VII of the
> Public Health Service Act, $1,678,943,000, to remain available
> through September 30, 2020…
>
> *Provided*, That the Secretary shall allocate new student loan
> borrower accounts to eligible student loan servicers on the basis of
> their performance compared to all loan servicers utilizing
> established common metrics, and on the basis of the capacity of
> each servicer to process new and existing accounts...
>
> *Provided further*, That for student loan contracts awarded prior to
> October 1, 2017, the Secretary shall allow student loan borrowers
> who are consolidating Federal student loans to select from any
> student loan servicer to service their new consolidated student
> loan…
>
> *Provided further*, That in order to promote accountability and high-
> quality service to borrowers, the Secretary **shall not award
> funding for any contract solicitation for a new Federal student
> loan servicing environment**, including the solicitation for the
> FSA Next Generation Processing and Servicing Environment as
> amended by the Department of Education on February 20, 2018,
> **unless such an environment provides for the participation of
> multiple student loan servicers that contract directly with the
> Department of Education to manage a unique portfolio of
> borrower accounts and the full life-cycle of loans from
> disbursement to pay-off** with certain limited exceptions, and
> allocates student loan borrower accounts to eligible student loan
> servicers based on performance…
>
> *Provided further*, That such servicers described in the previous
> proviso shall be evaluated based on their ability to meet contract
> requirements, future performance on the contracts, and history of
> compliance with applicable consumer protections laws…

"Department of Defense and Labor, Health and Human Services, and Education Appropriations

Act, 2019 and Continuing Appropriations Act, 2019," Pub. L. No. 115-245, Sept. 28, 2018, 132

Stat. 2981, Div. B, Title III (bold emphasis added).

102.    As these laws repeatedly reflect, Congress' intent and mandates would be completely frustrated were the Department to (i) funnel all Direct Loan servicing to a single contractor, or (ii) compartmentalize aspects of traditional student loan servicing work such that loan servicers could not manage the full life cycle with respect to their own unique portfolio of borrower accounts.

103.    Undeterred by Congress' repeated mandates, the EPS solicitation requires the single contract awardee to begin migrating customer accounts to its newly developed environment within six months of contract award, and the EPS solicitation includes the ability for that single contract awardee to perform a wide range of manual and critical loan servicing functions on all loans residing on its system.  In addition, *all* existing customer accounts are to be migrated to the new environment within ten months of the EPS contract award – meaning the Department has retained the flexibility to make the EPS awardee responsible for servicing the Department's entire portfolio of over 37 million student loan accounts, irrespective of Congress' directives.

104.    Compounding all of this are the facts that (i) the BPO solicitation contains no date for the receipt of proposals; (ii) neither the EPS solicitation nor the OPS solicitation contains any milestone(s) for onboarding BPO awardees to their respective platforms; (iii) the Department is under no obligation to make contract awards under the BPO solicitation, particularly if that solicitation is mired in its own protests; and (iv) the existing loan servicing contracts of MOHELA, GSMR and other loan servicers expire in September 2019.

105.    Thus, while the Department contends that multiple servicers will be able to compete for awards under the BPO solicitation, the Department has also made plans to obtain its loan servicing work for up to ten years from a single vendor under the EPS solicitation.  The

outcome is apparent from the EPS solicitation's requirement to "rapidly migrate" all existing loan accounts to the EPS vendor, as contrasted with the Department stating it will not even establish proposal due dates for the BPO solicitation until after the EPS contract is awarded. If MOHELA and GSMR lose all of their current servicing volume through the "rapid migration" to EPS, and then they are required to wait several years before becoming providers under the BPO solicitation, the Department will have effectively "starved out" both MOHELA and GSMR. The Department is required to comply with the Appropriations Acts provisions by revamping the solicitation process to provide from the outset for multiple student loan servicers – contracting directly with the Department – to provide BPO services immediately upon implementation of the EPS system.

106. Similarly, the OPS solicitation anticipates a single contract awardee and includes numerous critical loan servicing functions as well as an open-ended ability to procure "manual processing" related to financial functions, interface support and error/dispute investigation and processing. Thus, although the OPS solicitation does not clearly describe what requirements are being procured thereunder, the Department has drafted the OPS solicitation in a manner that could also include providing business process operations for the entire portfolio of student loan accounts contrary to the appropriations laws.

107. To the extent the EPS solicitation and OPS solicitation anticipate "teaming" among loan servicers and IT developers, such arrangements do not satisfy the FY 2018 and FY 2019 Appropriations Acts – which require that "for any contract solicitation for a new Federal student loan servicing environment," the Department must ensure "participation of multiple student loan servicers *that contract directly with the Department of Education*…" *See* Pub. L. No. 115-245 (emphasis added).

108.    It is equally important that the FY 2018 and FY 2019 Appropriations Acts obligate the Department to ensure that each loan servicer is assigned "to manage a unique portfolio of borrower accounts and the full life-cycle of loans from disbursement to pay-off …" *See id*.  The plain meaning of this statutory language is that each of the multiple servicers must be assigned a portfolio of borrower accounts that is unique to that servicer, which is responsible for managing those accounts through their full life-cycle from disbursement to pay-off.

109.    Now, via the EPS and OPS solicitations, the Department is dividing up portions of that loan servicing work, such that the single contractor selected under EPS (for current accounts) and under OPS (for future-state accounts) will perform some segments of the work, *e.g.*, manual processing related to payment processing, interface support, financial functions and error/dispute investigation and processing.  Consequently, loan servicers that are selected under the BPO solicitation will not be given the opportunity to service the full life-cycle of their portfolio of borrower accounts, which is directly contrary to the appropriations laws.

110.    MOHELA submitted questions to the Department as to how the EPS and OPS solicitations complied with the appropriations laws, but the Department has not responded.

111.    In sum, the EPS and OPS solicitations, while purporting to focus solely on procuring IT solutions, contain critical loan servicing functions that can be performed for up to ten years by the single EPS/OPS awardee.  As such, the EPS and OPS solicitations undermine the integrity and potential viability of the BPO solicitation and highlight the need for the Department to proceed with these solicitations on parallel tracks.  Moreover, the Department has structured the EPS and OPS solicitations in a manner that could create a servicing monopoly scheduled to last for many years, as well as a single point of failure that could result in tremendous difficulties and costs for the Department, the borrowers and the American taxpayers,

all of which directly conflict with Congress' mandate and intent expressed in the FY 2018 and

FY 2019 Appropriations Acts.  Consequently, the terms of the EPS and OPS solicitations are

arbitrary, capricious, and an abuse of discretion, and flatly contrary to applicable law.

## COUNT II

### THE NEXTGEN SOLICITATIONS
### VIOLATE THE HIGHER EDUCATION ACT

112.    Plaintiff incorporates by reference Paragraphs 1 through 111 as if fully set forth

herein.

113.    The Higher Education Act provides the Department its authority to "enter into

contracts for…the servicing and collection of loans made or purchased" in the Direct Loan

Program.  20 U.S.C. § 1087f(b).

114.    With respect to such contracts, the Higher Education Act further states:

> The entities with which the Secretary may enter into contracts shall
> include only entities which the Secretary determines are qualified
> to provide such services and supplies and will comply with the
> procedures applicable to the award of such contracts. In the case of
> awarding contracts for the origination, servicing, and collection of
> loans under this part, the Secretary shall enter into contracts only
> with entities that have extensive and relevant experience and
> demonstrated effectiveness. The entities with which the Secretary
> may enter into such contracts shall include, where practicable,
> agencies with agreements with the Secretary under sections
> 1078(b) and (c) of this title, if such agencies meet the
> qualifications as determined by the Secretary under this subsection
> and if those agencies have such experience and demonstrated
> effectiveness. In awarding contracts to such State agencies, the
> Secretary shall, to the extent practicable and consistent with the
> purposes of this part, give special consideration to State agencies
> with a history of high quality performance to perform services for
> institutions of higher education within their State.

20 U.S.C. § 1087f(b) (the "Special Consideration Law") (emphasis added).

115.    As relevant to the Special Consideration Law, MOHELA has a history of high-quality performance in student loan servicing and entered into agreements with the Department under 20 U.S.C. § 1078(b) and (c), which allowed participation in FFELP and under which loan servicing and collections work continue to be performed to this day.  Accordingly, the Department is required by statute to give "special consideration" to MOHELA in awarding contracts for the origination, servicing, and collection of loans.

116.    Similarly, GSMR has a history of high-quality performance in student loan servicing and its sister organization, NHHEAF, entered into agreements with the Department under 20 U.S.C. § 1078(b) and (c), which allowed participation in FFELP and under which loan servicing and collections work continue to be performed to this day.  Specifically, GSMR provides loan servicing work for those FFELP loans made by the New Hampshire Higher Education Assistance Foundation.  Accordingly, the Department is also required by statute to give "special consideration" to GSMR in awarding contracts for the origination, servicing, and collection of loans.

117.    Contrary to the foregoing Special Consideration Law, ***none*** of the three NextGen solicitations includes any such "special consideration" or preference for State agencies with agreements under 20 U.S.C. § 1078(b) and (c) and which have a history of high-quality performance.

118.    Further, MOHELA and GSMR have extensive and relevant experience and demonstrated effectiveness in student loan servicing, as well as a history of high-quality performance.  In fact, MOHELA has been ranked as the highest performing servicer, as measured by the Department's performance metrics, in every rating period in recent years.

119.     Contrary to the Special Consideration Law, the OPS and EPS solicitations do not even require offerors to have or submit past performance with respect to their student loan servicing work, let alone require that the selected contractor have "extensive and relevant experience and demonstrated effectiveness" in student loan servicing.  The Department's failure to require that the EPS and OPS offerors demonstrate their background in performing loan servicing functions is particularly alarming because, as set forth above, the EPS and OPS solicitations contemplate that the awardees could perform such work for up to ten years.

120.     MOHELA submitted questions to the Department asking how the EPS and OPS solicitations comply with the Special Consideration Law, but the Department has not responded.

121.     The Department's failure to comply with the statutory requirements of the Special Consideration Law in the context of procuring student loan servicing and debt collection work further renders the NextGen solicitations as arbitrary, capricious, and an abuse of discretion, and contrary to applicable law.

## COUNT III

### THE EPS AND OPS SOLICITATIONS
### IMPROPERLY CONSOLIDATE THE DEPARTMENT'S REQUIREMENTS

122.     Plaintiff incorporates by reference Paragraphs 1 through 121 as if fully set forth herein.

123.     The CICA requires that solicitations include specifications which permit full and open competition and contain restrictive provisions only to the extent necessary to satisfy the needs of the agency.  41 U.S.C. § 3306(a)(2).  Unless necessary to satisfy an agency's legitimate needs, this requirement is construed as precluding the bundling or consolidation of separate requirements in a solicitation where doing so restricts competition by excluding firms that can furnish only a portion of the requirements.

124.     Here, the EPS solicitation consolidates requirements that were <u>not</u> previously contracted on a bundled basis, namely, manual loan servicing work and the development of a new loan servicing IT system.  Similarly, the OPS solicitation is written so ambiguously that the Department could arguably include all of its business process operations support together with its acquisition of the loan servicing IT system.

125.     The business process operations aspect of this program includes all direct borrower interactions, *e.g.*, phone calls, e-mails, and mailings.  As set forth above, for the past ten years, the entire portfolio of non-defaulted student loan accounts under the Department's program has been serviced under multiple prime contracts between the Department and student loan servicers, including MOHELA and GSMR/NHHELCO.  Those contracts did not require the prime contractors to maintain or use a common loan servicing solution; rather, the loan servicers were able to use their own loan servicing system, or a licensed system of their choosing, and their contract pricing was required to include the costs for such systems that needed to be compliant for servicing federally-held debt.  Since the entities providing customer service have not previously had a need to develop such a loan servicing system, acquiring or developing such a system now, together with the actual servicing of the entire portfolio of student loan accounts on a bundled basis, has the potential effect of greatly limiting the competition.

126.     Further, the Agency has no reasonable need to acquire customer service for its entire portfolio of student loan accounts from a single entity, especially on terms that could extend for ten years, let alone from the same entity that develops the new IT system.  In fact, procuring the servicing component separately through multiple student loan servicers (as the Department has done in recent years) has the added benefit of enabling a servicing environment

that fosters competition and rewards superior performance – and would be consistent with the mandates of Congress in the FY 2018 and FY 2019 Appropriations Acts.

127.    Indeed, by separately soliciting loan servicing work under the BPO solicitation, the Department has already acknowledged that it does not actually need these two requirements – IT system development/implementation and loan servicing – to be procured under the same solicitation.

128.    Further, the Department's approach of acquiring all of its loan servicing work from the same, single entity providing the loan servicing IT system will create a servicing monopoly for a protracted period under the awarded EPS or OPS contracts, as well as a single point of failure that could result in tremendous difficulties and costs for the Department, the borrowers and the American taxpayers.  And, as noted above, the Department is not even asking that the EPS or OPS offerors provide any evidence demonstrating their experience or effectiveness in performing loan servicing functions.

129.    While the Agency may contend that awarding a single-system, single-servicer contract will be more administratively convenient than awarding multiple contracts under the BPO solicitation, or that the loan servicers can participate by teaming or subcontracting with the EPS and/or OPS contract awardee, relevant GAO bid protest decisions have held that such arguments do not justify consolidating the requirements.  This is especially true where the consolidation results in a single loan servicer – as well as in denying loan servicers the ability to manage unique portfolios of borrower accounts over their full life cycle – contrary to the explicit mandates of Congress in the FY 2018 and FY 2019 Appropriations Acts.

130.    For these reasons, the Agency's decision to bundle or consolidate in a single contract all, or a substantial portion of, servicing of the Department's entire portfolio of over 37

million student loan accounts with the acquisition of a common loan servicing system in the EPS and OPS solicitations is unreasonable and contrary to the CICA's requirements.

## COUNT IV

### THE NEXTGEN SOLICITATIONS
### VIOLATE THE COMPETITION IN CONTRACTING ACT

131.    Plaintiff incorporates by reference Paragraphs 1 through 130 as if fully set forth herein.

132.    The CICA requires contracting agencies to specify their needs and solicit proposals in a manner designed to achieve full and open competition, and to clearly delineate all significant factors and sub-factors that will be considered in the evaluation.  41 U.S.C. § 3306(a) and (b); *see also* FAR 15.304(d) and 15.101-1(b).

133.    Relatedly, FAR part 5 requires contracting agencies to publicize contract actions in order to increase competition and to include in those publications a "clear and concise description of the supplies or services that is not unnecessarily restrictive of competition and will allow a prospective offeror to make an informed business judgment" on whether to participate. *See, e.g.*, FAR 5.002 and 5.207.

134.    The milestones, objectives and operating elements of the EPS, BPO and OPS solicitations are structured in a manner that could be used to make the single EPS awardee responsible for servicing all or a substantial portion of the Department's entire portfolio of over 37 million student loan accounts for up to its full ten-year period, notwithstanding the fact that the EPS awardee was not required to submit past performance on its student loan servicing capabilities and notwithstanding the FY 2018 and FY 2019 Appropriations Acts mandating that any new environment include multiple servicers contracting directly with the Department.

135.     Only after making the EPS contract award will the Department then set a deadline
for submission of proposals under the BPO solicitation and begin the process of acquiring those
services.  Upon the BPO contract awards being issued and those contractors becoming "fully
operational," it is completely unclear if the EPS awardee or the BPO awardees will be
performing manual loan servicing work or if loan servicing work will be segregated among them
contrary to the Appropriations Acts.  For example, both the EPS and BPO solicitations include
manual work covering payment processing, loan consolidation origination applications and
request processing, treasury offset issues, and credit bureau disputes.  *Compare, e.g.*, BPO
solicitation, p. 58, § L-2.4.1.2 (requiring that the BPO offerors' proposed performance work
statement address "How the Solution will accurately, effectively, and efficiently execute contact
center support and back-office processing across the full life cycle of student
financing…[and]…How the Solution will execute … claims (e.g., discharge, forgiveness), credit
disputes and reporting, and consolidation origination.") and EPS solicitation, p. 10, § C.3.3.b
(requiring that the EPS awardee provide a solution as well as personnel to perform manual
intervention on, inter alia, payment processing, financial reporting, loan consolidation
origination, credit bureau research resolution and disputes, etc).  In addition, there are no pricing
mechanisms established under the EPS solicitation for loan servicing work.

136.     Concurrent with all of this, the OPS awardee will be building a new software
system for student loan processing that will be operational within two years.  Thereafter, the OPS
solicitation includes only a list of "TBD" milestones for launching unidentified operating
elements of the system.  Immediately upon implementation of the OPS solution, the Department
will need contractors to service the loans, yet there is no milestone or schedule whereby BPO
awardees will be on-boarded to that solution.  Rather, the OPS solicitation describes the required

support in an ambiguous manner that leaves offerors unsure if the OPS awardee itself will be responsible for servicing the Department's loan portfolio or, if not, whether/how the various aspects will be divided among which contractors.

137.    Altogether, these milestones create a conflated and confusing operational structure whereunder potential bidders such as MOHELA and GSMR are unable to identify which aspects of the procurement will actually include loan servicing work, let alone how the loan servicing work will integrate with the other solutions.

138.    In sum, the Department's inclusion of manual loan servicing work in the OPS and EPS solicitations conflicts with statutory requirements, leaves offerors confused about which aspects of the awarded contracts will be utilized for loan servicing, and undermines the milestones in all three solicitations.  Further, if the BPO solicitation is intended to be the Department's solution for loan servicing work, then there is no rational basis for the BPO solicitation progressing on a separate and substantially delayed path from the EPS and OPS solicitations.  The Court should require that the Department fulfill its statutory obligations by revamping the solicitations to ensure the BPO awardees – and only the BPO awardees – perform all loan servicing functions in the NextGen environment.

139.    For all of these reasons, and in violation of the CICA and FAR parts 5 and 15, the Agency has failed to delineate its requirements and objectives for the NextGen solicitations in a manner that enables offerors to make intelligent business decisions about which aspects of the procurement to compete upon, and has otherwise drafted its requirements in a manner that is so ambiguous as to preclude a fair competition.

**PRAYER FOR RELIEF**

**WHEREFORE**, for the reasons set forth herein, MOHELA and GSMR respectfully request that this Court enter judgment in MOHELA's and GSMR's favor and against Defendant, and provide the following relief:

A.    A judgment declaring that the terms of the Department's NextGen solicitations are arbitrary and capricious, an abuse of discretion, and otherwise violate the applicable appropriations laws, the Special Consideration Law, the CICA, and the FAR.

B.    Preliminary and permanent injunctive relief prohibiting the Department from proceeding with the NextGen solicitations until it has:

> (1) Removed business process operations (including related support activities such as print/mail, financial-related functions, manual processing/support, error/dispute resolution and other borrower interactions that encompass traditional loan servicing functions) from the EPS and OPS solicitations as an unlawful consolidation of requirements and contrary to the appropriations laws;
>
> (2) Established a procurement approach that ensures multiple student loan servicers contract directly with the Department from the start of implementing the EPS solution by conducting the BPO solicitation concurrently with the EPS solicitation;
>
> (3) Provided "special consideration" in the solicitations as required by the Special Consideration Law in the Higher Education Act to MOHELA, GSMR and other eligible contractors based on their participation in the FFELP and history of high-quality performance;
>
> (4) Established proposal and evaluation requirements that will ensure any contracts for loan servicing and collections are awarded only to entities that "have extensive and relevant experience and demonstrated effectiveness" as required by statute;
>
> (5) Clarified its requirements relative to all three NextGen solicitations to rectify their ambiguous and unlawful terms, and

(6) Provided interested offerors a fair and reasonable opportunity to compete.

C.    Alternatively, preliminary and permanent injunctive relief requiring the Department to cancel the current NextGen solicitation and issue new solicitations that provide for multiple loan servicers in compliance with the applicable appropriations statute, maximize competition under applicable law by affording MOHELA, GSMR and similarly-situated student loan servicers an opportunity to compete, and accurately reflect the Agency's needs.

D.    All such other relief as this Court may deem just and proper.

Respectfully submitted,

Scott F. Lane
One US Bank Plaza
St. Louis, Missouri  63101-1693
(314 552-6535 (tel.)
(314) 552-7000 (fax)
slane@thompsoncoburn.com (e-mail)

Attorney of Record for Plaintiffs
*Higher Education Loan Authority of the State of Missouri
and
Granite State Management and Resources*

Of Counsel:
Katherine S. Nucci
Jayna M. Rust
Thompson Coburn LLP
Dated:  April 1, 2019

## CERTIFICATE OF SERVICE

I hereby certify that on April 1, 2019, I caused copies of the Plaintiffs' Complaint to be served by electronic mail upon:

> Jana Moses, Esq.
> U.S. Department of Justice
> Commercial Litigation Branch
> P.O. Box 480
> Ben Franklin Station
> Washington, D.C.  20044
> Jana.Moses@usdoj.gov (e-mail)

Scott F. Lane